TRANS SHUTTLE, INC.; Mo's Express, LLC, d/b/a Mo's Express; and Jejaw Gosha, individually and d/b/a Hallelujah Shuttle, Plaintiffs/Applicants–Appellants,

v.

PUBLIC UTILITIES COMMISSION OF the STATE of Colorado, Defendant–Appellee.

No. 03SA156.

Supreme Court of Colorado.

May 3, 2004.

Hochstadt, Straw, Strauss & Silverman, P.C., Richard Strauss, Denver, Colorado, M. Andrew Andrade, Law Offices of M. Andrew Andrade, Greenwood Village, Colorado, Attorneys for Plaintiffs/Applicants–Appellants.

Ken Salazar, Attorney General, David A. Beckett, Assistant Attorney General, Larry A. Williams, Assistant Attorney General, Business and Licensing Section, Department of Law, Revenue/PUC Unit, Attorneys for Defendant–Appellee.

Justice RICE delivered the Opinion of the Court.

Petitioner–Appellants Trans Shuttle, Inc., and Mo's Express, LLC (collectively "appellants"),[1] seek review of the district court's decision which upheld penalties assessed against appellants by the Public Utilities Commission ("PUC").[2] The PUC determined that appellants had engaged in transporting persons in intrastate commerce without the prior issuance by the PUC of a certificate of public convenience and necessity ("CPCN"), as required by section 40–10–104(1), 11 C.R.S. (2003).

Appellants each hold a certificate issued by the Federal Motor Carrier Safety Administration or its predecessor (collectively "FMCSA"). These certificates authorize appellants to provide passenger service over interstate routes. They also authorize intrastate passenger service under limited circumstances:

> CONDITION: The carrier is authorized to provide intrastate passenger transportation service under this certificate *only* if the carrier also provides substantial regularly scheduled interstate passenger transportation service on the same route.

This language closely tracks the statutory language under which the certificate was granted. *See* 49 U.S.C. § 13902(b)(3) (2003).[3]

Appellants claim that because they hold these certificates, the PUC is without jurisdiction to assess penalties against them and that the PUC did not regularly pursue its authority in assessing the penalties. They also claim that the PUC engaged in improper rulemaking, that the district court imposed an improper standard of review, and that the PUC deprived appellants of their property without due process of law.[4] Appellants presented no evidence at their respective penalty assessment hearings to dispute the allega-

---

1. Jejaw Gosha, doing business as Hallelujah Shuttle, has dismissed its appeal and is no longer a party to this action.

2. This court has direct review of the district court's decision pursuant to section 40–6–115(5), 11 C.R.S. (2003).

3. The precise language of section 13902(b)(3) is as follows:

   Intrastate transportation by interstate carriers.—A motor carrier of passengers that is registered by the Secretary under subsection (a) is authorized to provide regular-route transportation entirely in one State as a motor carrier of passengers if such intrastate transportation is to be provided on a route over which the carrier provides interstate transportation of passengers.

4. The issues on appeal are:

   Whether the District Court erred in finding that the [PUC] has jurisdiction to issue a penalty against the Appellants who hold federal licenses to transport passengers and their baggage in intra- and interstate commerce; and whether the District Court erred in finding that the PUC "regularly pursued its authority" in determining that the operations of Appellants were not in compliance with their federal licenses.

   Whether the District Court erred in finding that the PUC, by imposing a standard for establishing compliance with Appellants' federal licenses, was not engaged in improper rule-making.

   Whether the District Court erred in its standard of review of a PUC decision when the issue is a challenge to jurisdiction of the PUC.

   Whether the District Court erred in finding that the PUC decisions did not deprive the Appellants of their property, i.e., their right to provide passenger service under their federal Certificates, without due process of law guaranteed to Appellants under the United States and Colorado Constitutions, including but not limited to the following:

   a. by finding that Appellants provided passenger service not in compliance with Appel-

tions of the PUC. Instead, they relied solely on their FMCSA certificates, claiming that they were in compliance with these certificates.

We affirm. We hold that the PUC has jurisdiction to regulate providers of intrastate transportation services and that the PUC properly pursued its authority in this matter. The PUC is clearly empowered to assess fines against parties providing intrastate passenger service without a CPCN. The evidence in the record amply demonstrates that appellants were engaged in providing for-hire transportation services that were entirely intrastate in nature. Because appellants provided no evidence to the contrary, the district court correctly affirmed the PUC's penalty assessment.

We also hold that the PUC proceedings were adjudicatory in nature and not rulemaking, and appellants were not denied their property rights without due process of law. Because we have determined that the PUC had jurisdiction to assess penalties against appellants, we do not need to address appellants' claim that the district court applied an incorrect standard of review.[5]

## I. Facts and Procedural History

### A. Trans Shuttle

On February 5, 2001, a PUC investigator spotted a Trans Shuttle vehicle [6] on level 5 of Denver International Airport ("DIA").[7] The investigator approached the vehicle and requested transportation to the Adam's Mark Hotel in Denver. The driver then transported the investigator to the Adam's Mark, whereupon the investigator paid a $17 fare and received a receipt. On March 17, 2001, the same investigator observed another Trans Shuttle vehicle on Level 5 of DIA. The investigator heard the driver announce that he was providing service to "Denver hotels downtown, door-to-door, and southeast." The investigator boarded the vehicle and was transported to the Adam's Mark. Again, the investigator paid a fare of $17 and received a receipt.

On April 4, 2001, the investigator observed two passengers disembark from a Trans Shuttle vehicle at the Adam's Mark. The passengers told the investigator that they had paid $17 each for transport from DIA to the Adam's Mark, and produced receipts indicating payment. The investigator did not ask the passengers how they had arrived at DIA.

The PUC issued a civil penalty assessment notice ("CPAN") against Trans Shuttle for providing intrastate passenger service without a CPCN,[8] in violation of section 40–10–104(1). Prior to the hearing on this CPAN,

lants' federal Certificates and in finding that Appellants were required to obtain a certificate from the PUC before providing said passenger service;

b. by finding that Appellants were not engaged in interstate commerce by picking up passengers and their baggage from DIA and taking them to Denver, Colorado;

c. by finding that the PUC had authority to interfere with Appellants' business in compliance with their federal Certificates;

d. by imposing on Appellants the burden of proof to show that they were in compliance with their federal Certificates rather than requiring the PUC to prove that the Appellants were not in compliance forthwith;

e. by imposing on Appellants the burden to prove that their interstate business was substantial without advising Appellants of the standard of proof to which they would be held.

5. Appellants argue that the district court applied an incorrect standard of review in determining whether the PUC had jurisdiction to assess penalties against appellants. They declare that a "rigorous de novo examination" was required, and they allege that the district court applied a more relaxed standard. Because we fully examine the PUC's jurisdiction over appellants under a de novo standard, we need not consider this argument.

6. Records of the Colorado Department of Motor Vehicles were introduced linking all the vehicles identified here to Trans Shuttle.

7. Commercial passenger carriers who have been granted access to DIA are equipped with automated vehicle identification tags. The tags allow DIA to monitor the access and location of these vehicles. Records were introduced from DIA's Landside Operations Manager which corroborated the testimony of the PUC investigator with respect to the time and location he identified each Trans Shuttle vehicle described here.

8. It is not disputed that Trans Shuttle does not possess a CPCN.

Trans Shuttle filed a motion to dismiss the proceedings, arguing that the PUC lacked jurisdiction over it because it was operating in interstate, not intrastate, travel pursuant to the authority granted to it by an FMCSA certificate. Trans Shuttle claimed that the FMCSA had exclusive jurisdiction to determine whether Trans Shuttle was operating in violation of the FMCSA certificate.

The administrative law judge ("ALJ") assigned to the case denied the motion, finding that the PUC, as a threshold matter, did possess jurisdiction to determine whether a particular transportation service provided was interstate or intrastate in nature. The ALJ found that the mere fact that Trans Shuttle possessed a FMCSA certificate did not deprive the PUC of the power to enforce the provisions of Title 40. To hold otherwise, the ALJ declared, would render the relevant provisions of Title 40 meaningless for all transportation service providers who happened to hold an FMCSA certificate, because the PUC would have no jurisdiction to ever determine if that provider was engaging in purely intrastate commerce. The ALJ determined that Trans Shuttle's argument presented an affirmative defense, and that Trans Shuttle therefore bore the burden of proof to show that it was acting in compliance with its FMCSA certificate.

Trans Shuttle appeared at its civil penalty hearing and was represented by counsel. However, even though its motion to dismiss had already been denied, Trans Shuttle presented no evidence to refute the PUC's allegations. Thus, the only evidence before the ALJ was the evidence presented by the PUC. The ALJ ruled that Trans Shuttle had violated section 40–10–104(1) on three occasions and civil penalties should be assessed. Trans Shuttle did not file exceptions to the ALJ's decision, and it therefore became the final PUC decision.

## B. Mo's Express

On February 5, 2001, a PUC investigator received a ride from a Mo's Express vehicle. The investigator was transported from DIA to the Westin Hotel in Denver. During the trip, the driver stated that he did not leave the Denver metropolitan area except for occasional trips west into the mountains. The driver further stated that he did not operate on a schedule. The investigator paid a fare of $17 and received a receipt which indicated "door-to-door" service.

Based on this information, the PUC issued a CPAN against Mo's Express for providing intrastate passenger service without a CPCN,[9] in violation of section 40–10–104(1). Mo's Express did not appear at its penalty assessment hearing, although its FMCSA certificate authorizing a variety of scheduled interstate and intrastate transportation was apparently entered into evidence. The ALJ found that the scant evidence in the record indicated that Mo's Express did not use any of the authority granted to it under its FMCSA certificate, as the services provided in this case were entirely intrastate and not offered as part of any scheduled operations. The ALJ therefore ruled that Mo's Express had violated section 40–10–104(1) and a civil penalty should be assessed. Mo's Express filed an exception to the ALJ's recommended decision, but this exception was denied by the PUC. Thus, the ALJ's ruling became the final PUC decision.

## C. The District Court Proceedings

The district court, considering both cases together, affirmed the PUC's assessment of civil penalties against Trans Shuttle and Mo's Express. After observing the standard of review mandated by section 40–6–115(3), the court found that the PUC regularly pursued its authority to regulate intrastate transportation of passengers, pursuant to section 40–10–104(1). The court therefore held that "it was not beyond the scope of the PUC's authority to issue a penalty against the Plaintiffs." The court noted that the ALJ's conclusions were adequately supported by evidence in the record. The court also noted that neither Trans Shuttle nor Mo's Express provided any evidence which might refute the PUC investigators' allegations, nor did they provide any evidence to establish that they were in compliance with their FMCSA certificates. The court de-

**9.** It is not disputed that Mo's Express does not possess a CPCN.

clared that Trans Shuttle and Mo's Express bore the burden of proof on the issue, and that in presenting no evidence they had failed to meet this burden.

## D. Related Federal Proceedings

In a related matter, Trans Shuttle filed suit against the PUC in federal district court, seeking injunctive relief from the PUC's assessment of civil penalties against them.[10] The district court ruled that the case should be dismissed because Trans Shuttle (and the other plaintiffs, none of whom is a current party to this proceeding) had an adequate remedy at law in the state courts. *Trans Shuttle, Inc. v. Pub. Utils. Comm'n*, No. 00–K–1458, slip op. at 3 (D.Colo. Dec. 12, 2000). The court stated:

> [Plaintiffs] have already been afforded the opportunity to present evidence to support their position that they were lawfully providing intrastate transportation services in the state of Colorado pursuant to federal authority and that such federal authority preempts the [PUC's] authority to regulate them. They lost before the [PUC], but have the opportunity to argue their position on appeal. It seems both unnecessary and unwise at this juncture to undertake a duplicative and parallel review of these issues in federal court. Federal review may be appropriate at a different juncture, for example, if Plaintiffs pursue their challenge in an action filed with the [FMCSA].

*Id.* at 3–4.

The Tenth Circuit Court of Appeals affirmed the district court's dismissal of the case. *Trans Shuttle, Inc. v. Pub. Utils. Comm'n*, No. 01–1025, 2001 WL 1355987 at *2 (10th Cir. Nov.5, 2001). The court of appeals held that the dismissal was appropriate under the abstention doctrine of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The court found that "Colorado provides suitable fora by which the shuttle operators may obtain a remedy for their alleged constitutional violation." *Id.* at *3. The court specifically rejected the claim that Colorado state courts lacked juris-

diction to determine whether the plaintiffs were in compliance with their FMCSA certificates. *Id.* The court also recognized the particularly strong state interest involved, because the PUC's "purpose is to protect the health and safety of its citizens who ride with these [intrastate] carriers and who share the roads with them." *Id.* at *5.

## II. Standard of Review

■ Judicial review of a PUC decision is governed by section 40–6–115. *Pub. Serv. Co. of Colo. v. Trigen–Nations Energy Co.*, 982 P.2d 316, 322 (Colo.1999). Review is limited to

> determin[ing] whether the [PUC] has regularly pursued its authority, including a determination of whether the decision under review violates any right of the petitioner under the constitution of the United States or of the state of Colorado, and whether the decision of the [PUC] is just and reasonable and whether its conclusions are in accordance with the evidence.

§ 40–6–115(3); *see Silverado Communication Corp. v. Pub. Utils. Comm'n*, 893 P.2d 1316, 1319 (Colo.1995). The reviewing court may not overturn the PUC's findings of fact if they are supported by substantial evidence in the record. *Powell v. Pub. Utils. Comm'n*, 956 P.2d 608, 613 (Colo.1998); *Boulder Airporter, Inc. v. Rocky Mountain Shuttlines, Inc.*, 918 P.2d 1118, 1121 (Colo.1996). This evidence must be viewed in the light most favorable to the PUC's decision. *Trigen–Nations*, 982 P.2d at 322; *Powell*, 956 P.2d at 613; *Boulder Airporter*, 918 P.2d at 1121. Furthermore, because the PUC has considerable technical expertise in the arena of public utilities regulation, the courts should accord deference to the PUC's interpretations of applicable statutes and regulations. *Trigen–Nations*, 982 P.2d at 322; *Boulder Airporter*, 918 P.2d at 1120. However, the courts must make an independent judgment on questions of law. *Trigen–Nations*, 982 P.2d at 322.

---

**10.** The penalties complained of in the federal proceeding were assessed for earlier violations that were similar in nature to the violations here.

## III. The PUC Has Jurisdiction to Assess Penalties and Regularly Pursued Its Authority

### A. The PUC Has Jurisdiction over Appellants

Section 40–7–113(1)(b), 11 C.R.S. (2003), permits the PUC to issue a civil penalty against any person operating as a common carrier without a CPCN as required by section 40–10–104. The PUC's authority to assess such penalties is, however, limited by state and federal law. By statute, the PUC may not regulate interstate commerce. *See* § 40–7–111, 11 C.R.S. (2003) ("None of the provisions of articles 1 to 7 of this title ... shall apply ... to commerce among the several states...."). Authority to regulate interstate commerce is vested in the federal government, *see* U.S. Const. art. I, § 8, cl. 3, and federal regulation of interstate commerce preempts any competing state regulation. *See id.* at art. VI, cl. 2.

The FMCSA was created by Congress to, among other things, regulate motor carriers engaged in the interstate transportation of passengers. *See* 49 U.S.C. § 113 (2003) (creating the FMCSA); 49 U.S.C. § 13902 (2003) (authorizing licensing of motor carriers). The FMCSA authorizes such carriers to provide "regular-route" intrastate transportation services "if such intrastate transportation is to be provided on a route over which the carrier provides interstate transportation of passengers." 49 U.S.C. § 13902(b)(3). Thus, the PUC may not regulate a carrier engaged in the intrastate transportation of passengers if such transportation is provided under FMCSA authority pursuant to section 13902(b)(3). Furthermore, the PUC is specifically preempted from regulating the rates or scheduling of any inter- or intrastate passenger transportation services operating over interstate routes. *See* 49 U.S.C. § 14501(a)(1) (2003). Outside of these proscriptions, however, the PUC's authority to assess penalties against carriers engaged in the intrastate transportation of passengers is not preempted by federal law.

Appellants do possess FMCSA certificates authorizing them to provide intrastate transportation services. While such authorization is limited only to circumstances where they "also provide[ ] substantial regularly scheduled interstate passenger transportation service on the same route," appellants claim that they are operating pursuant to this authority. However, appellants presented no evidence at the PUC hearing to support this assertion. Rather, appellants contend that the mere existence of their FMCSA certificates precludes the PUC from considering their activities, and that the PUC is without jurisdiction to determine whether they are, in fact, operating in compliance with those certificates. Appellants argue that the doctrine of primary jurisdiction dictates that any interpretation of their FMCSA certificates should be made by the FMCSA, not the PUC.

■ The doctrine of primary jurisdiction, sometimes called the deference doctrine, allows for judicial deference to an agency where such deference is necessary to promote uniformity and take advantage of the special expertise of that agency. *See Arapahoe County Pub. Airport Auth. v. Centennial Express Airlines,* 956 P.2d 587, 592 (Colo. 1998); *see also United States v. W. Pacific R.R.,* 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). However, the doctrine "should be utilized reluctantly where the issue is strictly a legal one that is within the conventional competence of the courts." *Centennial Express,* 956 P.2d at 592. Strictly speaking, the problem "is not one of jurisdiction.... Rather, the problem is one of harmony, efficiency, and prudence." *Mashpee Tribe v. New Seabury Corp.,* 592 F.2d 575, 581 n. 1 (1st Cir.1979).

■ While no fixed formula exists to determine when to apply the doctrine, *Centennial Express,* 956 P.2d at 592; *W. Pacific R.R.,* 352 U.S. at 64, 77 S.Ct. 161, certain factors have previously been identified by this and other courts. These factors are whether the controversy involves complex "technical questions of fact uniquely within an agency's expertise and experience," *Centennial Express,* 956 P.2d at 592, whether "uniformity and consistency require administrative discretion," *id.,* whether "the agency determination would materially aid the court," *Mashpee Tribe,* 592 F.2d at 581, and whether deference would prevent the prompt

resolution of the case. *Id.* (noting that the district court was correct to "not defer to administrative action of uncertain aid and uncertain speed"); *see also Nat'l Communications Ass'n v. Am. Tel. & Tel. Co.*, 46 F.3d 220, 223 (2d Cir.1995) ("The court must also balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings."). When examining these factors, a court or state agency must consider the facts of the particular case to determine whether deferring jurisdiction to the federal agency is appropriate. *See W. Pacific R.R.*, 352 U.S. at 69, 77 S.Ct. 161 (noting that the decision to defer on matters of railroad tariff construction should be made "based on the particular facts of each case"). With these principles in mind, we now consider whether the doctrine of primary jurisdiction should have been invoked in this case.

■ Many federal courts, as well as the FMCSA and its predecessors, have considered the issue of when intrastate transportation services may be offered under an FMCSA certificate. Thus, it is well settled that intrastate transportation of passengers under an FMCSA certificate is only authorized if the interstate transportation of passengers meets certain criteria. Specifically, the "interstate traffic 'must be a regularly scheduled service, it must be actual, it must be bona fide and involve service in more than one State, and it must be substantial.'" *Airporter of Colo., Inc., v. Interstate Commerce Comm'n*, 866 F.2d 1238, 1240 (10th Cir.1989) (quoting *Funbus Systems, Inc.*, ICC Nos. MC–C–10917, MC–153325 (Sub–No. 2), MC–C–10943, 1987 WL 100200 at *9 (Dec. 30, 1987) (not published)); *see also Boulder Airporter, Inc.*, 8 I.C.C.2d 553, 559 (1992). While the interstate and intrastate services need not be identical or offered in the same vehicle, the mere holding out to perform interstate transportation services on a particular route is not enough to support intrastate transportation on that route. *Funbus Systems*, 1987 WL 100200 at *9; *Boulder Airporter*, 8 I.C.C.2d at 558–59. Rather, "the interstate traffic must be substantial *in relation* to the intrastate traffic in that same

operation." *Airporter of Colo.*, 866 F.2d at 1241.

■ In the case at hand, the PUC presented evidence of the intrastate transportation of passengers. Appellants presented no evidence other than their FMCSA certificates. Thus, there was no evidence before the PUC that appellants were engaged in the interstate transportation of passengers that was regularly scheduled or substantial. Indeed, appellants did not present any evidence that they were actually engaged in the interstate transportation of passengers over the same routes as the intrastate transportation. Thus, the only evidence before the PUC clearly demonstrated intrastate transportation of passengers without the required nexus to interstate transportation of passengers.

While interpretation of the *Funbus Systems* test may in some circumstances involve "technical questions of fact uniquely within an agency's expertise and experience," *Centennial Express*, 956 P.2d at 592, we need not consider under what circumstances, if any, the PUC should defer to the FMCSA, because no such complex issues are present here. Similarly, the PUC has not created a risk of inconsistent rulings by not deferring to the federal agency, nor would an FMCSA determination materially aid the PUC or this court. Agency precedent regarding the need for substantial interstate passenger transportation connected to the intrastate transportation is clear, and appellants have not shown any interstate transportation whatsoever. Thus, there is no question that the FMCSA would reach the same conclusions were the case before them.

Appellants argue that *Service Storage & Transfer Co. v. Virginia*, 359 U.S. 171, 79 S.Ct. 714, 3 L.Ed.2d 717 (1959), and *Holland Industries v. Division of Transportation of the State of Missouri*, 763 S.W.2d 666 (Mo. 1989), dictate that the PUC should have deferred to the FMCSA. We find neither authority controlling.

In *Service Storage*, the carrier presented significant evidence that forced the Virginia courts to interpret whether the carrier was in compliance with its Interstate Commerce

Commission ("ICC") [11] certificate, and Virginia's interpretation of the certificate clearly conflicted with a declaratory ruling of the ICC. The Supreme Court therefore held that Virginia should have deferred to the ICC. Here, however, the evidence before the PUC conclusively indicated that appellants were offering purely intrastate passenger service. Moreover, unlike *Service Storage* where Virginia ignored the evidence presented by the carrier and reached a result contrary to ICC law, the PUC's determination clearly comports with existing FMCSA law, and no evidence was presented by appellants to persuade the PUC that it should defer its judgment to the FMCSA.

In *Holland Industries,* the Missouri Supreme Court relied on *Service Storage* in determining that the Missouri Department of Transportation ("MDOT") had no jurisdiction over Holland Industries ("Holland") based solely on Holland's possession of an ICC certificate. 763 S.W.2d at 669. The court reached this result even though evidence in the record clearly demonstrated that Holland was not operating pursuant to the authority granted to it by its ICC certificate. *Id.* ("Here, the ICC has issued a certificate, evidencing an assumption of jurisdiction over Holland's activities, both interstate and intrastate. MDOT's findings, supported as they may be, are irrelevant because it has no jurisdiction to act."). We acknowledge that *Holland Industries* may be difficult to reconcile with our result here today. However, to the extent that they cannot be reconciled, we simply decline to follow Missouri's decision.

The mere possession of an FMCSA certificate does not divest the PUC of all jurisdiction over those who possess the certificate. The strong public interest in PUC regulation of common carriers counsels against such a result. *See McKay v. Pub. Utils. Comm'n,* 104 Colo. 402, 413, 91 P.2d 965, 970–71 (1939) (noting the strong public interest in PUC regulation of common carriers); § 40–10–102, 11 C.R.S. (2003). Furthermore, as stated above, application of the doctrine of primary jurisdiction requires the reviewing court or agency to make a determination based upon the facts of the particular case.

Here, appellants relied solely on the existence of their FMCSA certificates, and the PUC and district court properly determined that, without more, deference to the FMCSA was not appropriate. Indeed, if the bare existence of an FMCSA certificate divested state agencies and courts of all jurisdiction over the holder of the certificate, the federal district court in *Trans Shuttle, Inc. v. Pub. Utils. Comm'n,* No. 00–K–1458, slip op. (D.Colo. Dec. 12, 2000), would have had little reason to abstain, nor would the Tenth Circuit Court of Appeals have upheld the district court's dismissal. *Trans Shuttle, Inc. v. Pub. Utils. Comm'n,* No. 01–1025, 2001 WL 1355987 at *2 (10th Cir. Nov.5, 2001).

We therefore hold that the PUC and the district court properly rejected the application of the primary jurisdiction doctrine.

## B. The PUC Regularly Pursued Its Authority

█ The PUC is empowered to regulate public utilities in Colorado. Colo. Const. art. XXV (vesting in the PUC all power to regulate public utilities). Common carriers are included within the statutory definition of a public utility. § 40–1–103(1)(a), 11 C.R.S. (2003); § 40–10–102. A common carrier includes every person or entity offering motor vehicle transportation to passengers for compensation. § 40–1–102(3)(a)(I), 11 C.R.S. (2003). Article 10 of title 40 sets forth the standards and rules regarding the PUC's regulation of common carriers. Section 40–10–104(1) mandates that "[n]o motor vehicle carrier shall operate any motor vehicle for the transportation of persons upon the public highways of this state in intrastate commerce without first having obtained from the commission a [CPCN]."

The PUC's authority to regulate common carriers is unquestionably in the public interest. *McKay,* 104 Colo. at 413, 91 P.2d at 970–71 (noting that "state regulation of common-carrier service ... is in the public interest" and "[t]he exercise of regulatory power [over common carriers] is primarily in the public interest"); § 40–10–102 ("All motor vehicle carriers ... are declared to be affect-

---

**11.** The ICC is a predecessor of the FMCSA.

ed with a public interest and subject to this article and the laws of this state...."). The PUC is therefore vested with broad authority to regulate public utilities. § 40–3–102, 11 C.R.S. (2003) ("The power and authority is hereby vested in the [PUC] ... to do all things ... which are necessary or convenient in the exercise of such power ...."); *see City of Montrose v. Pub. Utils. Comm'n*, 629 P.2d 619, 622 (Colo.1981) ("The [PUC] is invested with broad authority to regulate public utilities in this state."). Thus, in assessing civil penalties against appellants, the PUC is merely exercising its power to regulate motor vehicle carriers operating within the state. *See* § 40–3–102; § 40–10–102. This exercise of power is necessary for the PUC to fulfill its obligation to protect the health and safety of the public. *See City of Montrose*, 629 P.2d at 624 (noting that "the PUC has a general responsibility to protect the public interest regarding utility rates and practices"); *Trans Shuttle, Inc. v. Pub. Utils. Comm'n*, No. 01–1025, 2001 WL 1355987 at *5 (10th Cir. Nov.5, 2001) (noting that the PUC's "purpose is to protect the health and safety of its citizens who ride with these carriers and who share the roads with them").

Here, the PUC issued CPAN's against appellants pursuant to section 40–7–113. The CPAN's followed the procedures required by section 40–7–116, 11 C.R.S. (2003). These CPAN's included the nature of the violation, the date of the violation and the date of the notice, the maximum penalty amount, and information about contesting the violation in a hearing before the PUC. Thus, it cannot be said that the PUC did not follow regular procedures in issuing the CPAN's.

Furthermore, the opportunity for judicial review of the PUC's decision is sufficient to permit the PUC to fully adjudicate appellants' constitutional claims. Appellants are first entitled to review in district court. § 40–6–115(2). For constitutional claims, section 40–6–115(2) explicitly mandates that the district court make an "independent judgment on the law and the facts." Furthermore, appellants are entitled to review of the district court's determination in this court. *Id.* at § 115(5). Thus, "Colorado provides suit-

able fora by which [appellants] may obtain a remedy for their alleged constitutional violation." *Trans Shuttle*, 2001 WL 1355987 at *3.

Lastly, the PUC's penalty assessment determination was in accordance with the evidence before it. The evidence presented during the hearing showed that appellants provided services without a CPCN that were purely intrastate, as the travel originated and terminated within the state without any connection by the passenger to an interstate journey. Furthermore, the travel was clearly not part of any prearranged through-ticketing scheme, as evidenced by both the PUC investigator's testimony and his paying of the fare at the conclusion of the journey. Appellants were offered the opportunity to present evidence to prove their affirmative defense that they were operating pursuant to federal authority, but declined to do so.

Because we have already determined that federal law does not preempt the PUC's authority in this matter, we therefore hold that the PUC regularly pursued its authority in assessing penalties against appellants. The PUC acted pursuant to its constitutionally and statutorily granted authority, it did not violate any constitutional rights of appellants, and its decision was just and reasonable and in accordance with the evidence. *See* § 40–6–115(3).

## IV. The PUC Did Not Engage in Improper Rulemaking

Appellants claim that the PUC engaged in improper rulemaking by requiring them to prove that they were engaged in substantial interstate commerce. Appellants argue that application of this standard required the PUC to follow the rule-making procedures of section 24–4–103, 7B C.R.S. (2003), because the PUC was creating a new standard applicable to all carriers transporting passengers in intrastate travel pursuant to an FMCSA certificate. We are not persuaded. We recognize that there is not always a clear distinction between agency adjudication and agency rule-making. *See Colorado Office of Consumer Counsel v. Mountain States Tel. & Tel. Co.*, 816 P.2d 278, 284 (Colo.1991) ("While these APA provisions suggest that

agency rule-making functions are clearly distinct from agency adjudicative functions, the experience of agency process has proved to be to the contrary."). However, the proceedings before us today clearly fall on the side of adjudication.

A "rule" is defined as "the whole or any part of every agency statement of general applicability and future effect implementing, interpreting, or declaring law or policy or setting forth the procedure or practice requirements of any agency." § 24–4–102(15), 7B C.R.S. (2003). In contrast, an adjudication "involves a determination of rights, duties, or obligations of identifiable parties by applying existing legal standards to facts developed at a hearing conducted for the purpose of resolving the particular interests in question." *AviComm, Inc. v. Pub. Utils. Comm'n,* 955 P.2d 1023, 1030 (Colo. 1998). To determine whether the proceeding in question constitutes rule-making or adjudication, "we look to the actual conduct and effect of the particular proceeding, as well as to the purposes for which the proceeding was brought." *Id.* The mere fact that a particular proceeding may have collateral prospective effects on other similarly situated parties does not convert an adjudication into rule-making. *Id.; see also Douglas County Bd. of Comm'rs v Pub. Utils. Comm'n,* 829 P.2d 1303, 1307 (Colo.1992) ("As is often the case in adjudications by the judicial branch, collateral effects to third parties result from adjudicatory proceedings.").

Here, the PUC instituted penalty assessment hearings against appellants for alleged violations of existing law. The penalties assessed at these hearings were for prior violations by appellants and applied only to appellants. The facts required to resolve the issues before the PUC were specific to these particular proceedings. While the decisions of the PUC in these proceedings may in turn have effects on other similarly situated carriers operating pursuant to FMCSA certificates, the proceedings directly applied only to appellants, relying on facts specific to

appellants' operations, and therefore constituted adjudication. *See AviComm,* 955 P.2d at 1030 (holding that a proceeding was adjudicatory because "the PUC applied existing law to the facts of this case and the decision applied to identifiable parties").

## V. Appellants' Due Process Rights Were Not Violated

Appellants allege that they have been deprived of their property without due process of law, in violation of the Fifth and Fourteenth Amendments to the United States Constitution.[12] They claim that the PUC imposed an improper burden of proof upon them, that the PUC did not apprise them of what evidence would be required to meet this burden, and that the PUC prevented them from operating pursuant to the authority granted to them by their FMCSA certificates. These arguments are without merit.

The evidence submitted at the hearing presented a prima facie case that appellants were providing purely intrastate transportation services. Thus, the PUC properly imposed the burden on appellants to demonstrate that these intrastate transportation services were being offered pursuant to federally granted authority. *See W. Transp. Co. v. People,* 82 Colo. 456, 461–62, 261 P. 1, 3 (1927) (placing the burden of proof on the defendant-carrier to show that the PUC's enforcement action unduly burdened interstate commerce).

Appellants further claim that in order to meet the burden placed upon them, they were required to prove that they were engaged in "substantial interstate commerce" without being apprised of what evidence was necessary to demonstrate this. However, the ICC clearly explained what is meant by the term "substantial interstate commerce" and what evidence is required to demonstrate "substantial interstate commerce." *Funbus Systems, Inc.,* ICC Nos. MC–C–10917, MC–153325 (Sub-No. 2), MC–C–10943, 1987 WL 100200 at *9 (Dec. 30, 1987)

---

12. Appellants make five claims regarding their due process rights. *See* note 4, *supra.* However, some of these claims merely reiterate their belief that the PUC did not have jurisdiction to assess

penalties against them, an argument that we have already rejected. This section therefore only addresses those claims which present a new argument.

(not published) (detailing what evidence should be submitted to prove substantial interstate commerce); *see also Airporter of Colo., Inc., v. Interstate Commerce Comm'n,* 866 F.2d 1238, 1240 (10th Cir.1989) (detailing what evidence should be submitted to prove substantial interstate commerce, quoting *Funbus Systems*); *Boulder Airporter, Inc.,* 8 I.C.C.2d 553, 559 (1992) (showing only "timetables reflecting interstate operations, which are not supported by traffic studies showing actual interstate service, ... is not competent to sustain the validity of the intrastate authority in question"). Moreover, the PUC has explicitly adopted the *Funbus Systems* test. *ABC Carriers, Inc.,* PUC Decision No. C98–1024 at 8–11 (Oct. 1, 1998). Thus, it cannot be said that appellants were forced to meet an unarticulated standard of proof.

Appellants also claim that the PUC improperly deprived them of property rights granted to them by the FMCSA certificates. The PUC assessed penalties against appellants for violations of Colorado law, determining that appellants were in violation of section 40–10–104(1). The weight of evidence before the PUC clearly indicated that appellants were providing intrastate transportation services. The mere fact that appellants claim that they were operating pursuant to their certificates does not make it so. Thus, the PUC did not deprive appellants of their property rights under the FMCSA certificates. Appellants are still free to provide legitimate interstate and intrastate transportation services as authorized by those certificates.

 Lastly, we note that appellants received adequate procedural due process in the PUC hearings. Prior to the imposition of any penalty, appellants were afforded the opportunity to present evidence before the PUC to dispute the PUC's allegations. The hearings also provided the opportunity for cross-examination and argument by counsel. Appellants, however, chose to present no evidence and made the strategic decision to challenge the PUC entirely on a question of law rather than on any disputed facts. Appellants have also received judicial review in both the district court and this court. Thus, appellants have clearly not been denied procedural due process. *See Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' ") (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)); *Whiteside v. Smith,* 67 P.3d 1240, 1248 (Colo.2003).

## VI. Conclusion

We hold that the PUC has jurisdiction over appellants and regularly pursued its authority in assessing penalties against them. We further hold that the PUC proceedings were adjudicatory and not rule-making, and that the PUC did not deprive appellants of their property rights without due process of law. We therefore affirm the ruling of the district court.